# EXHIBIT 9

Grunley-Walsh

5010 Nicholson Lane, Suite 200
Rockville, MD 20852

January 25, 2007

United States Department of
The Interior – NPS
Denver Service Center
12795 W. Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287
**ATTN: John M. Fox, Contracting Officer**

**RE: Washington Monument Physical Security System**
**Contract No. 1443CX305998901; Task Order No. 35**

**Subj: Certified Claim/Request For Equitable Adjustment to Contract Amount Not In Contract Change Work - $25,702**

**Request For Contracting Officer's Final Decision**

Dear Mr. Fox:

Reference is made to our contract for the above Project as well as to Task Order No. 35. Reference is also made to our prior cost submissions for change work relating to: (1) Painting the Slot/Trench Drains at the Sidewalk Security Bollards; (2) Demolition and New Stone Work at the Bollard Control Boxes; (3) Repairing an Existing Waterline Valve; (4) Revised Grading and Drainage at the Sylvan Theatre Stage; and (5) Demolition and New Stone Work at Handicap Ramps on 15th Street Outside the Contract Limit Line. The unpaid additional cost to perform this change work totals **$25,702.**

Grunley-Walsh is herewith submitting these unpaid additional costs as a Certified Claim / Request For Equitable Adjustment ("REA") in accordance with the Contract Disputes Clause and the Contract Disputes Act. Attached as **EXHIBIT 1** is a complete itemization as well as supporting cost data for the additional costs requested herein. In submitting these claimed costs, we request a Contracting Officer's Final Decision on this matter within 60 days.

**Entitlement Overview**

On May 6, 1998 Grunley-Walsh was awarded an Indefinite Quantity Contract to stabilize and preserve the Washington Monument (Contract No. C3059980901). Pursuant to Contract Modification No. 0007, dated November 15, 2001, the General Provisions to our original contract were deleted and replaced with revised contract clauses which included certain FAR provisions incorporated by reference. Three of these provisions included the Changes clause (FAR 52.243-04 August 1987), the Disputes clause (FAR 52.233-01 December 1998) and the Differing Site Conditions clause (FAR 52.236-02 April 1986).

In accordance with the Contract, on December 5, 2003 Grunley-Walsh was issued Task Order No. T3059989135 (Task Order No. 35) in the amount of $13,993,216. Among other things, Task Order No. 35 required Grunley-Walsh to construct and install an above-ground security barrier system in accordance with certain specifications and drawings prepared under a previous Task Order by the Olin Partnership.[1] This included the construction of elements contained on NPS Drawing No. 807-41032. These drawings included the 90% construction documentation that existed as of November 2003. To prepare these drawings and to identify the work required in Task Order No. 35, the Olin Partnership was issued existing background drawings by the National Park Service.

During the course of the Project, the Park Service representatives directed numerous items of change work on an "ad hoc" basis, often as work was being performed. Compensation for many of these changes has already been provided for in Modifications 6, 7, 8 and 9. Unfortunately, we understand that after Modification 9 was negotiated, additional funds would have to be procured to pay for the cost of remaining unsettled change work. To our knowledge, this has never happened. As such, although we understand there is no dispute as to entitlement

[1] The Olin Partnership was Grunley-Walsh's design consultant for the work required in Task Order No. 35.

for this change work, Grunley Walsh and our subcontractors continue to remain unpaid for the performance of the following change work:

1. **Painting the Slot/Trench Drains at the Sidewalk Security Bollards**

The contract drawings required slot / trench drains in four locations were new sidewalk security bollards were to be installed. These slot / trench drains were similar in nature to the cast iron trench drains at the perimeter wall trip strip. For this reason, our subcontractor, Cherry Hill Construction, ordered cast iron slot / trench drains for the sidewalk security bollard locations, with the same unfinished appearance. In this regard, the Task Order 35 contract documents provided no specification as to any type of finished appearance for the slot / trench drains.

At the May 10, 2005 Project Meeting, however, the Park Service was asked if the storm drain grates surrounded by concrete or stone should be primed and painted black. (See 5/10/05 Meeting Minutes, Item 15.1.16 – attached as **EXHIBIT 2**). This issue was raised because previously the Park Service's representative (Steve Sims) had directed painting of the first slot / trench drain when it was installed by Cherry Hill. In response to this question, at the June 1, 2005 Project Meeting, the Park Service confirmed their direction that all storm drain grates, surrounded by concrete or stone, had to be primed and painted black. (See 6/1/05 Meeting Minutes, Item 15.1.16 – attached as **EXHIBIT 3**). At the meeting the Park Service (Mike Giller) recognized this to be a change and Grunley Walsh fully expected a contract modification for the cost of performing the change work.

As reflected in Cherry Hill Construction's RCO 951.24 (copy attached in **EXHIBIT 1**), this change work was performed and completed during the period between March 31, 2005 and June 23, 2005.




Painted Slot / Trench Drain

**2. Demolition and New Stone Work at the Bollard Control Boxes**

When Task Order No. 35 was issued, the contract drawings indicated the existence of security bollards in the sidewalks at the Northwest, Southwest, Northeast and Southeast locations. The drawings, however, did not indicate how the bollards were to be controlled.




Contract Drawing L4.8 as Issued on 11/25/2003

After Task Order No. 35 was awarded, a new set of drawings was issued on February 27, 2004. These drawings indicated the sidewalk security bollards would be hydraulically controlled from a pump vault located in the ground several feet from the bollards.




Drawing L4.8 as Issued on 2/27/2004

By letter dated July 27, 2004 (copy attached as **EXHIBIT 4**), the Contracting Officer defined the work / performance requirements for the new sidewalk security bollards to be installed. At the time, Grunley-Walsh believed the bollards would still be controlled from a hydraulic pump vault located in the ground several feet from the bollards. Modification No. 5, then incorporated the requirements for the operable bollards, specifically referencing the Contracting Officer's July 27, 2004 letter.[2]

Several months after the issuance of the Contracting Officer's July 27, 2004 letter, the Park Police (through the Park Service) requested the bollard control boxes be mounted in the

[2] Since Grunley-Walsh's contract price included costs to install a bollard system, Modification No. 5 did not provide compensation for the bollard system itself. Rather, the Modification simply made part of the Contract the specification requirements for the bollard system, set forth in the Contracting Officer's letter dated July 27, 2004.

wall adjacent to the bollards – as opposed to being in a ground vault. This was not a specified requirement in the Contracting Officer's letter of July 27, 2004. For this reason, on January 13, 2005 a design sketch was issued (copy attached as **EXHIBIT 5**) depicting the location for the bollard control box in the wall adjacent to the bollards. Thereafter a revised sketch was issued on May 12, 2005 (copy attached as **EXHIBIT 6**), which required a stone veneer finish on the bollard control box cover.




1/13/2005 Design Sketch Excerpt




Approved Bollard Control Box Which Had to Now be Mounted in the Wall

By January 2005 the walls in question had been constructed and the stone veneer had been set in place. As such, to mount the bollard control boxes in the wall, an existing piece of stone veneer had to be removed, the concrete behind the stone veneer had to be chipped away in order to accommodate the bollard control box and a new piece of stone veneer had to be manufactured for the control box cover.




Final Installation of Bollard Control Box and Stone Veneer Cover




Final Installation of Bollards and Control Box

The costs to chip away the concrete are included in Cherry Hill Construction's RCO's 951.28.01 and 951.28.02 (included in **EXHIBIT 1**). The costs to provide the replacement stone veneer are included in Lorton Contracting's time and material tickets (also included in **EXHIBIT 1**).

## 3. Repairing Existing Waterline Valve

In April of 2005, as site work around the Sylvan Theatre was proceeding an existing water line valve located near a sidewalk water fountain to the Southwest of the Sylvan Theatre.




Contract Drawing L2.7 Excerpt

At the request and direction of the Park Service's on site representative Grunley-Walsh was required to effect repair / replacement of the waterline valve to stop the leaking and water drainage from the leak. The cost for performing this change work is included in Cherry Hill Construction's RCO's 951.32 (included in **EXHIBIT 1**).




Vicinity of Water Line with Leaking Valve




Vicinity of Water Line with Leaking Valve

## 4. Revised Grading and Drainage at the Sylvan Theatre Stage

At the time Task Order No. 35 was issued, the grading plans depicted on drawing sheets L5.1 and L5.2, ended at the new security wall running past the front of the Sylvan Theatre stage. Due to the existing contours in this area, the drainage in front of the Sylvan Theatre stage needed to be revised to prevent flooding.




Contract Drawing L5.2 Excerpt

At the direction of the Park Service, to revise the drainage, test pits first had to be dug to determine the exact location of existing utilities. Then the existing drain lines and inlets had to be excavated and removed. Once removed, the new drain lines and a new drain inlet had to be installed. Finally, the area had to be regraded. The cost for performing this change work are included in Cherry Hill Construction's RCO's 951.31 and 951.36 (included in **EXHIBIT 1**).




Existing Drains in Front of the Sylvan Theatre Stage




Rough Grading in Front of the Sylvan Theatre Stage

**5. Demolition & New Stone Work at 15th Street Handicap Ramps Outside the Contract Limit Line**

The Task Order No. 35 contract demolition drawings, excluded from demolition an area along 15th street were two different stone handicap ramps existed.




Contract Drawing L2.4 Excerpt

The existing handicap ramps, however, were severally cracked and deteriorated. For this reason, the Park Service requested and directed that the existing stone at the handicap ramps be removed and replaced.




Existing, Cracked, Condition of Stone at Handicap Ramp



New Stone Set at Handicap Ramps Set in Place Prior to Paving

The cost for performing the demolition aspect of this change work is included in Cherry Hill Construction's RCO's 951.62.01 and 951.62.02 (included in **EXHIBIT 1**). The costs to provide the replacement stone are included in Lorton Contracting's time and material tickets (also included in **EXHIBIT 1**).

## Quantum Overview

The additional costs sought in this claim is for work performed by our subcontractors, Cherry Hill Construction Company (submitted in RCO's 951.24, 951.28.01, 951.28.02, 951.31, 951.32, 951.36, 951.62.01, and 951.62.02) and Lorton Contracting. Cherry Hill's costs are supported by daily work tickets, which indicate the site utility work which had to be performed. The total cost to Cherry Hill for this change work amounts to $13,031. The costs of Lorton Contracting amount to $10,599. Mark-ups allowed to Grunley-Walsh for this change work totals an additional $2,072. When added to subcontractors' cost, the total amount claimed is $25,702.

## Certification

Although this claim is less than $100,000, since the aggregate of claims Grunley-Walsh has submitted on this project exceed $100,000, this certification is provided in accordance with the Contract Disputes Act:

I certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amounts requested accurately reflect the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

Sincerely,

**GRUNLEY-WALSH, LLC.**

Bassem Soueidan
Operations Manager

Enclosures

cc: Roger C. Jones, Esquire (w/encls.)
Cherry Hill Construction (w/encls.)
Lorton Contracting Company (w/encls.)