# EXHIBIT 10

Grunley-Walsh

5010 Nicholson Lane, Suite 200
Rockville, MD 20852

RECEIVED
JAN 30 2007
DSC
CONTRACTING SERVICES

January 30, 2007

United States Department of
The Interior – NPS
Denver Service Center
12795 W. Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287
**ATTN: John M. Fox, Contracting Officer**

**RE: Washington Monument Physical Security System**
**Contract No. 1443CX305998901; Task Order No. 35**

**Subj: Certified Claim/Request For Equitable Adjustment to Contract Amount**
**Top Soil Change Work - $259,863**

**Request For Contracting Officer's Final Decision**

Dear Mr. Fox:

Reference is made to our contract for the above Project as well as to Task Order No. 35. Reference is also made to our prior cost submissions for change work relating to the top soil Grunley-Walsh was required to provide on the Project. The unpaid additional cost to perform this change work totals **$259,863**.

Grunley-Walsh is herewith submitting these unpaid additional costs as a Certified Claim / Request For Equitable Adjustment ("REA") in accordance with the Contract Disputes Clause and the Contract Disputes Act. Attached as **EXHIBIT 1** is a complete itemization as well as supporting cost data for the additional costs requested herein. In submitting these claimed costs, we request a Contracting Officer's Final Decision on this matter within 60 days.

**Entitlement Overview**

On May 6, 1998 Grunley-Walsh was awarded an Indefinite Quantity Contract to stabilize and preserve the Washington Monument (Contract No. C3059980901). Pursuant to Contract Modification No. 0007, dated November 15, 2001, the General Provisions to our original contract were deleted and replaced with revised contract clauses which included certain FAR provisions incorporated by reference. Two of these provisions included the Changes clause (FAR 52.243-04 August 1987) and the Disputes clause (FAR 52.233-01 December 1998).

In accordance with the Contract, on December 5, 2003 Grunley-Walsh was issued Task Order No. T3059989135 (Task Order No. 35) in the amount of $13,993,216. Among other things, Task Order No. 35 required Grunley-Walsh to construct and install an above-ground security barrier system in accordance with certain specifications and drawings prepared under a previous Task Order by the Olin Partnership.[1] This included the construction of elements contained on NPS Drawing No. 807-41032. These drawings included the 90% construction documentation that existed as of November 25, 2003. The drawings also clearly stated they were, "NOT FOR CONSTRUCTION". Likewise, the specifications indicated they were based on the 90% construction documentation that existed as of November 25, 2003 and, they too, clearly stated they were "NOT FOR COSNTRUCTION".

This claim stems from a mutual or, in the alternative, a unilateral mistake at the time Task Order No. 35 was issued. It involves understanding what the parties believed they were agreeing to, with respect to the top soil work, when Task Order No. 35 was awarded for the lump sum negotiated price of $13,993,216. For this reason, it is important to first understand the facts and circumstances leading up to the negotiated price for the Task Order.

[1] The Olin Partnership was Grunley-Walsh's design consultant for the work required in Task Order No. 35.

1. **Pre-Award Facts**

As the Park Service is aware, prior to Task Order No. 35, there were several Task Orders issued to effect the design development for the Project. After various preliminary studies, on April 11, 2002 Task Order No. 28 was issued for preparation/performance of Schematic Design and Design Development Services. In the course of providing these services, price and budget issues were constantly being addressed. It was Grunley-Walsh's understanding this information was necessary for the Park Service to procure funds in order to proceed with the future construction phase of the Project.

Given these circumstances, the starting point begins with the May 16, 2003 issuance of the 100% Design Development drawings and specifications. As these documents were simply for Design Development purposes, they too clearly stated, "NOT FOR CONSTRUCTION." However, based on the issuance of these documents, Grunley-Walsh was able to begin the process of soliciting prices from subcontractors for performance of the construction work. Grunley-Walsh was also able to solicit value engineering suggestions that may help to reduce the cost of construction.

The May 16, 2003 Specifications included Section 02920 (copy attached as **EXHIBIT 2**) which set forth the requirements for "Soil Preparation", including the requirements for various topsoil mixes to be utilized in different locations around the project site. The soil mixes varied based on the amount/percent of "base component material" that was to be utilized in each of the mixes. The specifications also required the base component material to be a mixture of "sand" and "sandy loam" (i.e. a classification of top soil), consisting of 2 parts sandy loam to 5 parts sand (see Specification Section 02920, pages 8-9, in **EXHIBIT 2**). Based on this criteria, the amount of sand to be mixed with organic material was going to be an unusually high percentage. It was also going to add significant cost to the price for the actual landscaping construction work.

This cost concern first became apparent in the summer of 2003 as Grunley-Walsh began receiving preliminary pricing from subcontractors to perform the work. For example, in an August 14, 2003 proposal received from Chapel Valley (attached as **EXHBIT 3**), the proposed cost for the 3 different specified soil mixes ranged from $45 per cubic yard to as high as $65 per cubic yard. To put this cost in perspective, it is important to understand the plan was for each soil mix to be a minimum of 12" deep and the 65 acre site was going to require literally thousands and thousands of cubic yards of soil mix. The cost was expected to be several millions of dollars.

This fact concerning the costs for the soil mixes was communicated to the Park Service (Mike Donnelly) during the summer of 2003. Needless to say, Mr. Donnelly was astonished and he requested suggestions for reducing the price. To quote Mr. Donnelly, "we are the National Park Service; we can grow grass on rocks."

In response to Mr. Donnelly's request, Grunley-Walsh received an October 3, 2003 revised bid/pricing (copy attached as **EXHIBIT 4**) from Cherry Hill Construction, to perform the site work. The base amount of this bid totaled $3,185, 864, and was premised on excluding Specification Section 02920 altogether. Instead, Cherry Hill proposed to provide 6" (as opposed to 12") of off-site top soil (in lieu of the specified soil mixes) that would be in accordance with the District of Columbia DPW Standard Specification for Highways and Structures 1996, Section 822.1 – Topsoil (copy attached as **EXHIBIT 5**) (hereinafter the "top soil alternative"). This top soil alternative contemplated a topsoil sand mix of not less than 15%; nor more than 50%. By contrast, the Specifications contemplated a sand mixture of up to 85%, depending on the soil mix locations. When Grunley-Walsh communicated this bid/price to the Park Service (Mike Donnelly and Mike Fox), they agreed with the topsoil alternative concept proposed by Cherry Hill because of the significant price saving that would be achieved.

Thereafter, by email dated Monday, November 24, 2003 (copy attached as **EXHIBIT 6**) the Park Service (Mike Donnelly), forwarded to Grunley-Walsh a "Request for Price Proposal, Task Order #35". Even though this email was received the day before the November 25, 2003 drawings and specifications were issued, the RFP attached to the email stated, "[w]e request that you provide your price proposal directly to this office no later than November 25, 2003." The RFP also stated, **"[t]his Request for Price Proposal should be based on the 100% complete Specifications and Drawings for the referenced project."**

At the time (i.e., November 24, 2003) a 100% complete set of Specifications and Drawings did not exist for the project. Rather, all that existed was a 100% set of Design Development Specifications and Drawings, which specifically stated they were "NOT FOR CONSTRUCTION".

The email accompanying the Park Service's RFP also advised Grunley-Walsh the Park Service wanted to "negotiate" the RFP on Wednesday morning (i.e., November 26, 2003). A price proposal was submitted by Grunley-Walsh on November 25, 2003 and negotiations did, in-fact, occur on November 26, 2003. During these negotiations it was made clear to the Park Service that Grunley-Walsh's site work price was from Cherry Hill, in the amount of $3,185,864, which included Cherry Hill's proposed alternative for topsoil (in lieu of the specified soil mix requirements). In fact, a copy of Cherry Hill's bid proposal (**EXHIBIT 4**) was provided to the park service as part of Grunley-Walsh's price submission.

As a result of the parties' negotiations, on Wednesday, November 26, 2003 Grunley-Walsh provided/emailed the Park Service their "Final, Final, Final, Proposal" in the total amount of $13,993,215.96 (copy attached as **EXHIBIT 7**). In this proposal, the Site Work price was identified as a specific line item, in the amount of $3,185,864; representing the bid amount Grunley-Walsh received from Cherry Hill, premised on Cherry Hill's alternative top soil approach.

Grunley-Walsh's "final, final, final, proposal" to the Park Service was not immediately accepted. After submission of the "final, final, final, proposal", the Government was closed for the Thanksgiving holiday. Eventually, on Friday, December 5, 2003, Grunley-Walsh understood the Park Service accepted the "final, final, final, proposal" when the Park Service issued Task Order No. 35, for the lump sum amount of $13,993,216 – the exact amount of Grunley-Walsh's proposal (rounded-up by 4¢ to the nearest dollar).

As stated above, the Task Order and the accompanying Attachment 1, both indicated they included the work in the "construction drawings and specifications prepared by Olin Partnership (DWG. #087/41032)." What this "DWG #087/41032" refers to has always been a mystery. As of December 5, 2003, the latest set of drawings and specifications which had been issued by Olin Partnership were dated November 25, 2003 and indicated they were "NOT FOR CONSTRUCTION". These specifications also contained the same Section 02920 (copy attached as **EXHIBIT 8**) which set forth the requirements for "Soil Preparation", including the requirements for various topsoil mixes to be utilized in different locations around the project site. In this regard, at the time the November 25, 2003 specifications were issued, the Olin Partnership was unaware of the discussions between Grunley-Walsh and the Park Service concerning Cherry Hill's alternative top soil approach.

**2. <u>Legal Principles</u>**

Human beings make mistakes. It happens all the time. It even happens in contracting. For this reason, we understand the law of contracts recognizes the concepts of mutual mistake and unilateral mistake. Further, we understand that were contract mistakes occur, reformation is required to set forth the true intent of the parties. The Court of Appeals for the Federal Circuit recently discussed these concepts in *National Australia Bank v. U.S.,* 452 F.3d 1321 (C.A. Fed. 2006),stating:

> An erroneous mutual belief about the contents of a written agreement is sufficient to constitute a "mistake"; for this purpose: reformation is available " 'when the parties, having reached an agreement and having attempted to reduce it to writing, fail to express it correctly in the writing.' " *Indiana Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8*, 314 F.3d 895, 903-04 (7th Cir.2003) (quoting Restatement (Second) of Contracts, § 155, cmt. a (1981)); *see also Philipine Sugar Estates Dev. Co. v. Gov't of Philipine Islands*, 247 U.S. 385, 389, 38 S.Ct. 513, 62 L.Ed. 1177 (1918) (noting that "[i]t is well settled that courts of equity will reform a written contract where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties," and that "[t]he fact that interpretation or construction of a contract presents a question of law and that, therefore, the mistake was one of law is not a bar to granting relief.").

Where, as in this case, a mutual mistake is evident based on the contract itself and the parties contemporaneous conduct, looking beyond the words used in the contract becomes essential for determining the true intent of the parties. Task Order No. 35 refers to drawings and specifications prepared by Olin Partnership under previous Task Order. It doesn't identify what drawings and specifications, except for a reference to "DWG #087/41032", which Grunley-Walsh has never received. The May 2003 drawings are much different than the November 2003 drawings. Likewise, the May 2003 specifications are much different than the November 2003 specifications. Moreover, both the May and the November drawings and specifications expressly indicate they are "NOT FOR CONSTRUCTION." Clearly, the design was still a "work in progress." Thus, these facts by themselves raise questions that can not be answered by looking at just the "four corners" of Task Order No. 35.

What did the Park Service intend? What did Grunley-Walsh intend? Who was providing the design? And, more importantly, who was the scrivener of the Task Order? These questions can be answered, simply by looking at the pre-award history of Task Order No. 35. Clearly, Grunley-Walsh was responsible for providing a design that would work within the Park

Service's budget. This was an open process. Bid prices were disclosed and discussed with the Park Service. The final Task Order amount was negotiated based on facts both parties had within their possession. One such fact was the top soil alternative, which had been proposed and agreed upon due to cost considerations.

### 3. <u>The Top Soil Change Work Required</u>

Despite the understandings between Grunley-Walsh and the Denver office of the Park Service concerning the alternative top soil approach, as work on the Project proceeded and it became time to begin the top soil operation, it became apparent the local Park Service representatives were uninformed about the pre-award discussions concerning the topsoil alternative to be provided by Cherry Hill. However, the local Park Service representatives did recognize the top soil sand content contemplated by the specifications was excessive. As such, the requirements of the specifications were abandoned.

In this regard, the Chief Arborist for the local DC Park Service, Rob DeFeo, issued a Memorandum on March 23, 2005 (copy attached as **EXHIBIT 9**), setting forth what he believed to be the "Best Practices" for topsoil in the Washington DC region. His Memo indicated that, in top soil for both seed and soding purposes, the sand mix should be 60% to 65%. Although such a sand mix ratio was less than the specified ratio, it was still a great deal higher than what Grunley-Walsh and Cherry Hill had contemplated at the time the lump sum price for Task Order No. 35 was negotiated.

Shortly after receipt of the March 23, 2005 "Best Practices" Memorandum, Grunley-Walsh received an undated letter from the Contracting Officer (copy attached in **EXHIBIT 10**). This letter stated, "[t]he Park Service has provided 'Best Practices' for soil preparations that reflect what is in the specification."[2] Although Grunley-Walsh disagreed, we reasonably

[2] The Contracting Officer's letter also stated that 6" of topsoil (as opposed to 12") was required per the contract.

understood the Park Service was now directing Grunley-Walsh to provide topsoil with a sand mix of 60% to 65%. In addition, the Contracting Officer's letter indicated the top soil was to receive a "soil amendment" (i.e. known as "leaf grow"). These requirements were a contract change and a change from what had been agreed upon at the time the Task Order lump sum amount had been negotiated.

Thereafter, at a meeting with the Park Service on March 30, 2005, Grunley-Walsh again reiterated their position that any requirement by the Park Service to provide topsoil different from the topsoil alternative (i.e., the DC DPW Standard of 15% to 50% sand) agreed upon at the time of contracting would be a change for which Grunley-Walsh expected payment. The next day, Grunley-Walsh received an April 1, 2005 self serving letter from Mr. Giller of the Park Service (copy attached in **EXHIBIT 11**), which misstated what was discussed at the March 30th meeting. However, the letter again reiterated Grunley-Walsh was to provide topsoil prepared in accordance with their "Best Practices". In doing so, the Park Service now stated:

> The 'Best Practices' supersedes the specifications with respect to the proportion of sandy loam and organics. The percentage of sand is reduced.[3]

Again, this represented a contract change and a change from what had been agreed upon at the time the Task Order lump sum amount had been negotiated. However, at least the Park Service recognized the specifications were being abandoned (i.e. superseded). Nevertheless, Grunley-Walsh still maintained its position that any requirement by the Park Service to provide top soil different from the agreed upon top soil alternative would be a change for which Grunley-Walsh expected payment.

---

[3] The Park Service's letter of April 1, 2005 also stated that 6" of topsoil (as opposed to 12") was required per the contract.

Thereafter, at a jobsite meeting on April 22, 2005, the Park Service continued to dictate changed requirements for preparation of the top soil, including an inefficient procedure for placing the topsoil and ripping the subsoil 16" to 22". A copy of the April 22, 2005 Meeting Minutes is attached as **EXHBIT 12**. This was not acceptable to Grunley-Walsh. By our letter dated April 25, 2005 (copy attached in **EXHIBIT 13**), Grunley-Walsh told the Park Service the exact procedure we would be following.

On May 2 through 6, 2005, some initial loads of topsoil were delivered to the Project site. Grunley-Walsh had this top soil tested and, by transmittal dated May 13, 2005 (copy attached in **EXHIBIT 14**), provided the test results to the Park Service. In doing so, Grunley Walsh noted the top soil satisfied the DC DPW standards for top soil; having a sand content of no more than 50%.

By letter dated May 17, 2005 (copy attached in **EXHIBIT 15**), the Park Service rejected the top soil; stating "a significant amount of additional sand is necessary to meet the contract required topsoil gradation." Again, Grunley-Walsh disagreed. However, by letter dated May 17, 2005 (copy attached in **EXHIBIT 16**), Grunley-Walsh acknowledged that it would proceed in accordance with the Park Service's directives. Thereafter, the Invoice Statements from Campbell Sand & Gravel Company (copies attached in **EXHBIT 17**), establish that Grunley-Walsh had over 2,616 tons of sand delivered to the Project site during the period between May 19, 2005 and June 24, 2005.

In addition, to comply with the Park Service's directives, Grunley-Walsh was required to purchase 3,500 yards of "leaf grow" (dark brown in appearance) from our Subcontractor, Davey Tree. Then began the arduous and time consuming process of mixing the sand, the top soil and the leaf grow for spreading and placement prior to sodding.

United States Department of
The Interior – NPS
Denver Service Center
Top Soil
Change Work Claim
January 30, 2007
Page 11








Mixing Sand, Leaf Grow and Top Soil



Mixing Sand, Leaf Grow and Top Soil

**Quantum Overview**

The additional costs sought in this claim is for work performed materials supplied by our subcontractors, Cherry Hill Construction Company (submitted in RCO's 951.34, 951.38, 951.38.01, 951.38.02, 951.47.01, 951.47.02, 951.47.03 and 951.64), Davey Tree, Alpine Services and Cambell Sand & Gravel. Cherry Hill's costs are supported by daily work tickets, which indicate the work which had to be performed. The total cost to our Subcontractors / Suppliers for this change work amounts to $238,912. Mark-ups allowed to Grunley-Walsh for this change work totals an additional $20,951. When added to our Subcontractor / Supplier cost, the total amount claimed is $259,863.

**Certification**

In accordance with the Contract Disputes Act:

I certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amounts requested accurately reflect the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

Sincerely,

**GRUNLEY-WALSH, LLC.**

Bassem Soueidan
Operations Manager

Enclosures
cc: Roger C. Jones, Esquire (w/encls.)
Cherry Hill Construction (w/encls.)
Davey Tree (w/encls.)